## J. W. Bishop Company vs. Curran & Burton.

## Curran & Burton vs. J. W. Bishop Company.

### JUNE 17, 1910.

Present:  Dubois, C. J., Blodgett, Johnson, and Parkhurst, JJ.

(1)  *Evidence.*

In an action for damages occasioned by the collapsing of a structure erected by defendants, Q. "What in your judgment would you say about the building, whether it was proper or not to build a building as that building was built, with only those sticks stuck in the ground?" was properly excluded, the witness having said nothing about "sticks stuck in the ground," and no exhibit of any kind being introduced at the time purporting to represent such a building for the purpose of giving the jury an idea of what was meant; and further, since it was not an hypothetical question, based upon previous testimony.

(2)  *Evidence.*

Evidence should be contained in the testimony of a witness; not found in the questions of counsel.

(3)  *Evidence.*

A question to a witness as to whether he gave orders, at the time of an accident, for the moving of a portion of the wrecked structure was properly admitted as cross-examination of his statement that he did not have general authority.

(4)  *Building Construction.   Contracts.   Requests to Charge.*

In an action for damages occasioned by the collapsing of a structure, erected by defendant, request to charge that if the jury found that defendant was employed by plaintiff to construct a coal wharf under certain plans and specifications, and on completion the same gave way, then defendant would be liable for all reasonable expenses in placing the plant in the condition that it was originally intended it should be according to the plans and specifications, was properly refused;   since it does not include a statement that the giving way was a necessary consequence of the failure of defendant to comply with the plans and specifications, nor does it state that plaintiff was free from fault or negligence in the premises.

(5)  *Same.*

Another request to charge that if the jury found defendant was employed to construct the wharf under certain plans and specifications, and was fully informed as to the uses to which it was to be put, and the load that would be placed thereon, and with such information drew plans and specifications, and represented that the structures would carry the load, and the same

gave way, and became unfit for the uses to which it was understood that they were to be put, then defendant would be liable for all reasonable expenses plaintiff was put to in placing the plant in the condition that it was originally intended it should be, in accordance with the plans and specifications, and in accordance with the conversation between the parties preliminary to entering into the contract, if the conversations were found to be as claimed by plaintiff and formed a part of the contract, was properly refused; since it did not state that the failure of the structures was in no way due to the negligence of plaintiff, and furthermore, because it is objectionable in that it proposed to submit a question of law to the jury, viz., whether a certain conversation, preliminary to entering into a contract, formed a part thereof.

ASSUMPSIT. Heard on exceptions of parties defendant in first action and plaintiffs in second action, and overruled.

DUBOIS, C. J. These are actions of assumpsit, whereof the first was brought by a building corporation against the defendant copartners to recover the balance alleged to be due under a completed contract to build a coal-handling plant upon the premises of the copartnership; the second was brought by the copartnership against the corporation to recover damages, occasioned by the settling, collapsing, and breaking down of the various structures erected by said corporation by reason of its non-performance of the contract aforesaid according to plans and specifications. The cases were consolidated and tried together, before a jury in the Superior Court, with the result that a verdict for the plaintiff corporation was rendered in the first-named case for the sum of $5,803.56, an amount exactly eight thousand dollars less than that claimed by the corporation, and a verdict for the defendant was rendered in the second case. Messrs. Curran & Burton filed their motion for a new trial in each case upon the grounds that the verdict was against the law and the evidence, and the motions were denied by the justice who presided at the trial; they then filed their bills of exceptions, each grounded upon the exception taken to the denial of their motion for a new trial, and ten other exceptions taken to rulings or refusals to rule on the part of said justice, during the progress of the trial, the first of which arose during the examination of Oscar Briggs, by Mr. Potter, for

Curran & Burton, in the following manner: "Q. 22. What in your judgment would you say about the building, whether it was proper or not to build a building as that building was built, with only those sticks stuck in the ground?" This question was objected to and was properly excluded. The witness had said nothing about "sticks stuck in the ground," and it does not appear that any picture, model, or exhibit of any kind was introduced at the time, purporting to represent such a building, for the purpose of giving the jury an idea of what was meant. Neither was it an hypothetical question based upon testimony already introduced. It seems to have (2) been a gratuitous assumption on the part of counsel, which is subject to the criticism that evidence should be contained in the testimony of the witness rather than be found in the questions of the counsel. Furthermore, the declaration in the second case, which is the foundation of the copartners' claim for damages, is based upon the corporation's breach of contract in not building, according to the plans and specifications prepared for that purpose, the structures which afterwards gave way. The question should have been, "was that building built according to the plans and specifications therefor," rather than, "whether it was proper to build a building as that building was built." The copartners, therefore, take nothing by their exception.

The second exception relates to the admission of the following question asked Mr. Wheelock, in cross-examination, by Mr. Bassett: "Q. 235. And in running string-pieces from one post to another you necessarily find some poles that are larger than others, don't you?" It was evidently a preliminary question, and clearly within the discretion of the court to permit; but as it was never answered, no harm ensued. The exception therefore fails.

The third exception relates to the following question asked of and answered by Samuel M. Gray, C. E., in cross-examination, by Mr. Bassett: "Q. 142. Will you testify that there is any coal bin now standing in the city of Providence that doesn't vary more than two feet from the perpendicular? A. No,

sir." The witness had just previously stated that he had no knowledge regarding the variations of coal bins from the perpendicular. And after the foregoing exception had been taken, he was asked: "143 Q. Do you know anything about that? A. No, sir." No harm was done and the exception is of no value.

(3)    The fourth exception is to the ruling of the court in admitting the following question asked in cross-examination of Charles F. Anthony, manager, in Providence, of Curran & Burton: "395. Q. At the time of this accident, did you give orders to Bishop & Company to take down the wrecked portion of the digger trestle and place the timber on some place on the property that you designated?" The judge admitted it, as he said, "in cross-examination of his statement that he did not have general authority." The answer given was: "A. I think I communicated about it; it did not originate with me." We think the ruling was proper, and that no injury resulted therefrom.

The fifth exception was taken to a ruling of the court permitting the counsel for Bishop & Co. to ask O. Perry Sarle, C. E., in direct examination, the following question: "106 Q. And what have you marked upon the plan which you now have before you, Mr. Sarle?" The witness had testified as follows: "105 Q. Is there still another plan which you have not testified to as yet? A. The plan which shows the location of the harbor line with reference to the fender piles at certain points." After some discussion the witness proceeded to answer Q. 106, as follows: "I have shown the fender piles at certain points which are indicated also on the plans. That is to say, the piles on one place which is driven just—I number, say pile twelve, fourteen, sixteen, and so on, so you can go from this plan onto the other to find the location of any one of these several piles which I have shown you. I have marked where the harbor line comes"———. The transcript then discloses the following colloquy: "MR. POTTER: That part I object to, as to where these things are as to the harbor line. THE COURT: Those things have been gone into and Mr. Sarle has prepared

a plan which has been introduced.——MR. POTTER: Not that one. THE COURT: At any rate, if Mr. Sarle has prepared a plan of the location of these piles I think he can show it. MR. POTTER: As to the fender piles, I wish to object to that and have an exception to it. Exception taken by Mr. Potter," whereupon the witness finishes his answer as follows: "I have marked the position of the harbor line with reference to the several piles noted here on the plan." We see no impropriety in the ruling. In filling or wharfing out into the public waters the established harbor line can not be ignored by the riparian proprietor or persons in his employ. A harbor line serves at once the purposes of 'an invitation and a prohibition, and it marks the boundary between license and nuisance. The invitation is to fill or wharf out to it, the prohibition is not to wharf or fill beyond it.

The sixth exception arose during the examination of Robert F. Brown, secretary and general manager of the J. W. Bishop Company, recalled as a witness in rebuttal by Mr. Bassett, as follows: "18 Q. Have you your original specifications on the first contract which you prepared, or the first plans which you prepared for the bins, Mr. Brown? A. I have the specifications. 19 Q. As submitted to Curran & Burton. You have them? A. I have the estimates. 20 Q. The estimates on those plans? MR. POTTER: Now, wait a minute, please. That has all, for one thing, been gone into on the direct, and I don't know sure whether my client will be able to be here tomorrow or not. He is in his bed to-day. I hope he will be, but I am in a position where I must defend his rights because I may not be able to answer. But that has been gone into in the direct, and he testified to it, as I understand it. Is this something about the eighty-five thousand dollar matter? WITNESS: Yes, sir. MR. POTTER: Then I object to it because that has been gone into. MR. BASSETT: I was going to offer at this time those original specifications, under those plans, which speak for themselves. MR. POTTER: I object to it most seriously because they never were submitted to Mr. Burton. He never examined them. They simply made some sketches

and talked about the thing in a general way.   He did not know what this man had in his mind about construction and a dozen things why this should not be gone into now.   That has been gone into once, and these should have been offered when I had a chance to meet it and explain it.   THE COURT:   Mr. Burton, in his testimony, said the only difference between the eighty-five thousand plan and the sixty-three or sixty-one thousand dollar plan was the difference in the capacity of the coal bins, and I have a note in which he said he didn't know of any other difference except the difference in the capacity of the coal bins. MR. BASSETT:   I would call his attention particularly to that rebuttal of Mr. Burton's testimony.   THE COURT:   I should say, in rebuttal, Mr. Bassett, although this witness did generally speak of the matter, I think he can produce—there was specifications delivered to Mr. Burton, if he can produce them.   Exception taken by Mr. Potter.   21 Q.   These are the specifications, Mr. Brown?   A.   These are the estimates.   22 Q.   The estimates I mean?   A.   Yes, sir."   As it appears by the transcript that Mr. Burton afterwards was able to be, and was, present and did testify in relation to the matter, the apprehension of counsel proved to be groundless; moreover, the matter was admissible in rebuttal.

The seventh and eighth exceptions also were taken during the examination of Mr. Brown, as appears from the following extract from the transcript (p. 970):   "40 Q.   After the failure of this wharf, Mr. Brown, did Mr. Gray prepare any plans and specifications for the rebuilding and remodelling of the wharf? A.   He handed me plans and specifications he said he had prepared.   41 Q.   And how did those plans—have you those plans and specifications?   A.   Yes, sir.   42 Q.   Are those the ones you hold in your hand?   A.   These are the ones.   MR. POTTER: What bearing has that?   I don't want to object if it has any. I don't see that it does, now.   That will run, if it goes any distance, into that attempted compromise that failed.   MR. BASSETT:   We threshed this all out and I don't think it is necessary for me to repeat my argument.   THE COURT:   I think Mr. Bassett may ask.   I think your inquiry is as to

whether or not he has the plans. (Question No. 42 read by stenographer.) THE COURT: Mr. Brown may answer that. WITNESS: Yes, sir. MR. BASSETT: We offer those plans and specifications. MR. POTTER: That I object to, and if ruled in I wish to save my exception. THE COURT: Were these plans and specifications for Mr. Brown to work upon? MR. BASSETT: Yes, sir. MR. POTTER: Let me ask a question or two. 43 Q. (By Mr. Potter.) Those plans and specifications were handed to you after the time of this accident, were they not? A. Yes. 44 Q. And they were to be used or carried out under some arrangement or compromise that you and Mr. Burton had entered into? A. That was entirely before any compromise was talked. MR. POTTER: Then what have they to do here? MR. BASSETT: I can tell about that. THE COURT: Well, the jury may retire. Mr. Potter objects to the introduction of the plans and specifications prepared by Mr. Gray, upon which a bid was made by the J. W. Bishop Company after the failure of the wharf and bins. THE COURT: Well, in cross-examination I think you can go into that matter, but I don't see how I can exclude Mr. Bassett from asking this witness whether or not these plans were the plans upon which Mr. Gray erected the wharf, and, if so, what he thinks would be a fair price and also to go so far as to state whether he ever made a bid upon those plans, without any notion of compromise as it might be. I think he can testify to that. Of course, you could cross-examine him and also make your argument, but I think Mr. Bassett can inquire what would be a fair price for building such a structure, or doing such work, and put the plans in. MR. POTTER: I shouldn't object to that if it' was anyone else except Mr. Brown. THE COURT: He has an interest that may be urged against him, but he is surely qualified to testify as to the work. Exception taken by Mr. Potter. THE COURT: The jury may return. MR. BASSETT: We offer these plans and specifications and ask they may be marked. 45 Q. Mr. Brown, I will ask you how nearly these plans and specifications, which have now been introduced in the case, agree with plans and specifications and the work done by Mr. Gray in rebuilding

this wharf and trestle? A. That I am unable to answer, because I have never seen the plans and specifications that they say they followed in rebuilding the trestle. 46 Q. Well, as to the work which has actually been done, as it has been described in this case, I will ask you whether these plans and specifications substantially followed that same line of work? A. I think the position of the piles in front of the wharf is somewhat different. The comparing of one plan to the other will readily determine, I think. 47 Q. In other particulars is there any difference? A. As I said before, not having seen the plans and specifications to which Mr. Gray repaired his wharf actually, I am unable to say. 48 Q. As to the work as done upon the wharf as described? A. As most of the work that is called for in these plans and specifications is below ground, I am unable to say. 49 Q. Well, then, I will have to ask you what is called for by these plans and specifications in detail. MR. POTTER: Which ones? MR. BASSETT: The ones which he has introduced. 50 Q. Will you state generally, then, what is required by the plans and specifications upon which you figured? A. On the plan there is shown a row of piles driven as closely together as possible immediately in front of the old wall. MR. POTTER: When you mention the old wall you mean the sea wall? WITNESS: The only wall I ever knew to be there. This row of piles seems to be capped with timber and in front of the row of piles there seems to be a piece of timber through which a tie rod passes, back to a 12 x 16 hard pine timber with a little concrete in front of it; some thirty feet, I should say, back of the wall. And then half way between the face of the wall and the cap log he has noted piles three or four feet on centres, going longitudinally with the wharf, and under the cap log he has noted piles about the same distance apart longitudinally. Outside of this fender piles are shown in section but not in elevation. Under the rear leg of the digger trestle he has shown four piles with a 10 x 12 timber grillage on top and placed on this a concrete pier. Resting on the cap log over the piles in front of the wharf is a 10 x 12 girder from the cap log back onto the wall. On this is placed the flooring of the wharf. I

also notice that the digger trestle legs, instead of being placed directly on the cap log, the front leg seems to be back, possibly a foot from the cap log.  51 Q. Would there be, in your opinion, more or less work in the plan as prepared, to which you have now testified, than the plan that Mr. Gray finally adopted?  A.  I should say that there would be more piles in this scheme, for the reason that he calls for a close line of piles directly in front of the wharf, in addition to the two rows of piles, one half-way between the wall and the cap log and one under the cap log.  52 Q.  Did you make an estimate upon the work required to be done by Mr. Gray under these plans and specifications?  MR. POTTER: Just a minute.  I have no objection so far.  When he shows that the thing is different from all the evidence here, shows that he has gone back in that specification to the plan that Daly had, driving piles in front of the wall, and that his estimate for doing the work in that way was so much——MR. BASSETT: If it appears that this plan was more expensive it certainly couldn't be anything Mr. Potter could complain of.  THE COURT:  If you had shown clearly that this was the same plan or if you had shown clearly that this plan, in regard to which he is speaking now, did involve more labor or material or was a more expensive plan than Mr. Gray's, I think I should permit you to ask him for an estimate. He hasn't, so clearly as he might, answered either of those things.  Exception taken by Mr. Potter."

The seventh exception relates solely to Mr. Bassett's offer of the plans and specifications in evidence.  Mr. Potter's objection, as above stated, was simply because they were offered through the medium of Mr. Brown.  We do not regard the objection as tenable.

The eighth exception was taken to question 52 aforesaid: "Did you make an estimate upon the work required to be done by Mr. Gray under these plans and specifications?" which the court evidently regarded as prematurely asked, as appears from his remarks hereinbefore quoted.  No ruling had been made to which this exception could be applied.  It is therefore unavailing.

The ninth exception is not pressed.

The tenth exception relates to the refusal of the judge presiding at the trial to charge the jury in accordance with the following requests:

(4)     " 1.   If the jury find that J. W. Bishop Company were employed by Curran & Burton to construct a coal wharf and plant under certain plans and specifications and certain structures in said plant, to wit the bin, wharf, wharf and digger trestles, and on completion thereof the same gave way and became unfit for the use to which they were intended to be put to, then the said J. W. Bishop Company would be liable to Curran & Burton for all reasonable expenses that they were put to in placing said wharf, bin, and digger trestle, in the condition and fit for the purposes that it was originally intended that they should be according to the said plans and specifications.     .

" 2.   If the jury find that J. W. Bishop Company were employed by Curran & Burton to construct a coal wharf and plant under certain plans and specifications and were fully informed as to the uses and purposes to which the wharf and plant were to be put to and the load that would be placed thereon, and having had such information the said J. W. Bishop Company drew plans and specifications and represented to Curran & Burton that the structures in accordance with said plans and specifications would carry the load and strain that would come thereon and certain structures, to wit the bin, wharf and digger trestle on the completion thereof gave way and became unfit for the uses and purposes to which it was understood that they were to be put to, then the said J. W. Bishop Company would be liable to Curran & Burton for all reasonable expenses they were put to in putting said wharf, bin and digger trestle in the condition that it was originally intended that they should be, in accordance with the said plans, specifications, and in accordance with the conversation between the parties preliminary to entering into the contract, if the said conversations are found to be as claimed by Curran & Burton and formed a part of the contract."

" 5.   If the jury find that J. W. Bishop Company knew or

reasonably might have known as to the condition of the soil under the bin and wharf and failed to bring this knowledge to the attention of Curran & Burton and the said bin, wharf, and digger trestle, as built by said J. W. Bishop Company, became injured and unfit for the purposes to which it was intended they should be put, through any failure in the foundations of the said bin, wharf and digger trestle, by reason of the condition of the soil under the said bin, wharf, and digger trestle, then J. W. Bishop Company is liable to Curran & Burton in recoupment for all reasonable expenses they have been put to in placing the bin, wharf and digger trestle in a condition suitable for the uses and purposes for which they were intended."

The first request was properly refused because it is incomplete; it does not, as it should, include a statement that the giving way and unfitness of the structures, therein referred to, was a necessary consequence of the failure of the Bishop company to comply with the plans and specifications prepared for the building of the same, nor does it state that Curran & Burton were free from fault or negligence in the premises.

The second request is also subject to the objection that it does not state that the failure of the structures was in no way due to the negligence of Curran & Burton. Furthermore, it is objectionable in that it proposes to submit a question of law to the jury, viz., whether a certain conversation preliminary to entering into a contract formed a part of the contract.

The fifth request was properly refused, as the court had already fully covered the same in his charge.

The last exception is that taken to the decision of the court denying their motion for a new trial upon the ground that the verdict is against the law and the evidence. The principal objection urged is that the damages awarded in favor of the J. W. Bishop Company are excessive, or, conversely, that the damages allowed Curran & Burton are inadequate. It appears that after the J. W. Bishop Company had constructed the wharf, digger-trestle, coal bin, and other structures which constituted the coal-handling plant contracted for with Messrs. Curran & Burton, and after a large quantity of coal had been placed

thereon by said Curran & Burton, the wharf gave way and the structures thereon collapsed; and it became necessary to reconstruct the plant, at great expense, and a dispute arose between the parties as to whether the giving way of the wharf and consequent collapse of the structures, superimposed thereon, was due to their inherent weakness or was caused by overloading or, was partly caused by weakness and partly by overloading. In consequence of this dispute Curran & Burton refused to pay the balance due under the contract, whereupon the J. W. Bishop Company brought suit to recover the same, and Messrs. Curran & Burton brought suit to recover from the J. W. Bishop Company the loss, costs, and damages they had sustained through the failure of the structures to carry the burden imposed upon them. These suits are the actions above referred to. It is manifest that the questions raised thereby are questions of fact, and therefore are peculiarly within the province of a jury. The jury have determined the issues presented, and have allowed the J. W. Bishop Company a portion of their bill; and it is apparent that they have also allowed Curran & Burton eight thousand dollars damages by way of recoupment. It does not appear, and, indeed, it is not alleged, that the jury were influenced by passion, prejudice, or any other improper motive, or were guided by anything but a desire to do their full duty in the premises. They saw and heard the witnesses, and we can not say, from our consideration of the evidence, that they have made such a grievous error that the verdict should be set aside. But there is a further consideration, and that is that the judge who presided at the trial, who also saw and heard the witnesses and the jury, who observed the conduct of the case, has set the seal of his approval on the verdict. In such circumstances the rule referred to in *Wilcox* v. *Rhode Island Co.*, 29 R. I., 292, should be invoked and the exception be held to be invalid.

For the foregoing reasons the exceptions of Messrs. Curran & Burton are overruled and the cases are remitted to the Superior Court with direction to enter judgment on the verdicts.

*Bassett & Raymond,* for J. W. Bishop Co.

*R. W. Richmond,* of counsel.

*Dexter B. Potter, Edward A. Stockwell,* for Curran & Burton.